T.C. Memo. 2004-269

UNITED STATES TAX COURT

GARY D. AND JOHNEAN F. HANSEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25191-96.         Filed November 24, 2004.

<u>Wendy S. Pearson</u>, <u>Terri A. Merriam</u>, and <u>Jennifer A. Gellner</u>,
for petitioners.

<u>Nhi T. Luu-Sanders</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOLDBERG, <u>Special Trial Judge</u>:  Respondent determined that
petitioners are liable for a section 6662(a) accuracy-related
penalty of $1,545 for the taxable year 1991.  Unless otherwise
indicated, section references are to the Internal Revenue Code in

effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The sole issue for decision is whether petitioners are liable for the section 6662(a) accuracy-related penalty for negligence or disregard of rules or regulations in the year in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first, second, third, and fourth stipulations of facts and the attached exhibits (excluding those withdrawn at trial) are incorporated herein by this reference. Petitioners resided in Kennewick, Washington, on the date the petition was filed in this case.

I. Walter J. Hoyt III and the Hoyt Partnerships

The accuracy-related penalty at issue in this case arises from an adjustment of a partnership item on petitioners' 1991 Federal income tax return. This adjustment is the result of petitioners' involvement in certain partnerships organized and promoted by Walter J. Hoyt III (Mr. Hoyt).

Mr. Hoyt's father was a prominent breeder of Shorthorn cattle, one of the three major breeds of cattle in the United States. In order to expand his business and attract investors, Mr. Hoyt's father had started organizing and promoting cattle breeding partnerships by the late 1960s. Before and after his

father's death in early 1972, Mr. Hoyt and other members of the Hoyt family were extensively involved in organizing and operating numerous cattle breeding partnerships. From about 1971 through 1998, Mr. Hoyt organized, promoted to thousands of investors, and operated as a general partner more than 100 cattle breeding partnerships. Mr. Hoyt also organized and operated sheep breeding partnerships in essentially the same fashion as the cattle breeding partnerships (collectively the "investor partnerships" or "Hoyt partnerships"). Each of the investor partnerships was marketed and promoted in the same manner.

Beginning in 1983, and until removed by this Court due to a criminal conviction, Mr. Hoyt was the tax matters partner of each of the investor partnerships that are subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324. As the general partner managing each partnership, Mr. Hoyt was responsible for and directed the preparation of the tax returns of each partnership, and he typically signed and filed each return. Mr. Hoyt also operated tax return preparation companies, variously called "Tax Office of W.J. Hoyt Sons", "Agri-Tax", and "Laguna Tax Service", that prepared most of the investors' individual tax returns during the years of their investments. Petitioners' 1991 return was prepared in this manner and was signed by Mr. Hoyt. From approximately 1980 through 1997, Mr. Hoyt was a licensed enrolled

agent, and as such he represented many of the investor-partners before the Internal Revenue Service (IRS) before he was disbarred as enrolled agent in 1998.

Beginning in February 1993, respondent generally froze and stopped issuing income tax refunds to partners in the investor partnerships. The IRS issued prefiling notices to the investor-partners advising them that, starting with the 1992 taxable year, the IRS would disallow the tax benefits that the partners claimed on their individual returns from the investor partnerships, and the IRS would not issue any tax refunds these partners might claim attributable to such partnership tax benefits.

Also beginning in 1993, an increasing number of investor-partners were becoming disgruntled with Mr. Hoyt and the Hoyt organization. Many partners stopped making their partnership payments and withdrew from their partnerships, due in part to respondent's tax enforcement. Mr. Hoyt urged the partners to support and remain loyal to the organization in challenging the IRS's actions. The Hoyt organization warned that partners who stopped making their partnership payments and withdrew from their partnerships would be reported to the IRS as having substantial debt relief income, and that they would have to deal with the IRS on their own.

On June 5, 1997, a bankruptcy court entered an order for relief, in effect finding that W.J. Hoyt Sons Management Company

and W.J. Hoyt Sons MLP were both bankrupt. In these bankruptcy cases, the U.S. Trustee moved in 1997 to have the bankruptcy court substantively consolidate all assets and liabilities of almost all Hoyt organization entities and the many Hoyt investor partnerships. This consolidation included all the investor partnerships. On November 13, 1998, the bankruptcy court entered its Judgment for Substantive Consolidation, consolidating all the above-mentioned entities for bankruptcy purposes. The trustee then sold off what livestock the Hoyt organization owned or managed on behalf of the investor partnerships.

Mr. Hoyt and others were indicted for certain Federal crimes, and a trial was conducted in the U.S. District Court for the District of Oregon. The District Court described Mr. Hoyt's actions as "the most egregious white collar crime committed in the history of the State of Oregon." Mr. Hoyt was found guilty on all counts, and as part of his sentence in the criminal case he was required to pay restitution in the amount of $102 million. This amount represented the total amount that the United States determined, using Hoyt organization records, was paid to the Hoyt organization from 1982 through 1998 by investor-partners in various investor partnerships.

II.  Petitioners and Their Investment

Petitioner wife (Ms. Hansen) is a high school graduate and a licensed respiratory care practitioner.  Petitioner husband (Mr. Hansen) has a college education, with a bachelor of science degree in civil engineering and architecture.  During the year in issue, Ms. Hansen was employed as a respiratory therapist, and Mr. Hansen was employed as a civil engineer.  At the time they invested in the Hoyt partnerships, petitioners' investment-related experience comprised the purchase of their residence, the purchase of a term life insurance policy and Government bonds, the use of savings accounts, and Mr. Hansen's investments in his employment-related retirement account.  Petitioners did not have any prior experience with farming or cattle.

Petitioners first heard about the Hoyt partnerships from Mr. Hansen's co-workers in 1986.  At the suggestion of one of these co-workers, who was himself an investor in a Hoyt partnership, petitioners attended an informational session about the partnerships at the Red Lion Hotel in Pasco, Washington, in the latter part of 1986.  Mr. Hoyt and others involved in the Hoyt organization attended the session, where a presentation was given concerning the nature of the Hoyt partnerships and how they were being marketed as a retirement investment.  While at this session, petitioners discussed the Hoyt partnerships with individuals who had already made investments in the partnerships.

Petitioners first invested in the Hoyt partnerships in late 1986. Prior to investing, petitioners received promotional material prepared by the Hoyt organization. Petitioners relied on these promotional materials which, in general, provided rationales for why the partnerships were good investments and why the purported tax savings were legitimate. One document on which petitioners relied, entitled "Hoyt and Sons -- The 1,000 lb. Tax Shelter", provided information concerning the Hoyt investment partnerships and how they purportedly would provide profits to investors over time. The document emphasized that the primary return on an investment in a Hoyt partnership would be from tax savings, but that the U.S. Congress had enacted the tax laws to encourage investment in partnerships such as those promoted by Mr. Hoyt. The document stated that an "investment in cattle [is arranged] so the cash required to keep it going is only about seventy five percent" of an investor's tax savings, while the other twenty-five percent of the tax savings is "a thirty percent return on investment." This arrangement purportedly provided protection to investors: "If the cows do die and the sky falls in, you have still made a return on the investment, and no matter what happens you are always better off than if you paid taxes." After an explanation of the tax benefits, the document asked: "Now, can you feel good about not paying taxes, and feeling like

you were not, somehow, abusing the system, or doing something illegal?"

A section of the "1,000 lb. Tax Shelter" document that was devoted to a discussion of audits by the IRS stated that the partnerships would be "branded an 'abuse' by the Internal Revenue Service and will be subject to automatic" and "constant audit". Statements in the document compared the IRS to children, stating that IRS employees did not have the "proper experience and training" and "working knowledge of concepts required by the Internal Revenue Code" to evaluate the partnerships. In a section of the document titled "Tax Aspects", the following "warning" was given:

> Out here, tax accountants don't read brands, and our cowboys don't read tax law. If you don't have a tax man who knows you well enough to give you specific personal advice as to whether or not you belong in the cattle business, stay out. The cattle business today cannot be separated from tax law any more than cattle can be separated from grass and water. Don't have anything to do with any aspect of the cattle business without thorough tax advice, and don't waste much time trying to learn tax law from an Offering Circular.

Despite this warning, the document spent numerous pages explaining the tax benefits of investing in a Hoyt partnership and explaining why investors should trust only Mr. Hoyt's organization to prepare their individual tax returns:

> It is the recommendation of the General Partner, as outlined in the private placement offering circular, that a prospective Partner seek independent advice and counsel concerning this investment. * * * The Limited Partners should then authorize the Tax Office of W.J. Hoyt Sons to prepare their personal returns. * * * Then you have an

affiliate of the Partnership preparing all personal and Partnership returns and controlling all audit activity with the Internal Revenue Service. * * * Then, all Partners are able to benefit from the concept of "Circle the Wagons," and no individual Partner can be isolated and have his tax losses disallowed because of the incompetence or lack of knowledge of a tax preparer who is not familiar with the law, regulations, format, procedures, and operations concerning the Partnership that are required to protect the Limited Partners from Internal Revenue audits. * * * If a Partner needs more or less Partnership loss any year, it is arranged quickly within the office, without the Partner having to pay a higher fee while an outside preparer spends more time to make the arrangements.

Finally, the document warned that there remained a chance that "A change in tax law or an audit and disallowance by the IRS could take away all or part of the tax benefits, plus the possibility of having to pay back the tax savings, with penalties and interest."

At the time that she initially made the investment in 1986, and through the year in issue, Ms. Hansen believed that she owned cattle through the investment and that the investment would produce a profit and provide retirement income.[1] She also believed the Hoyt promotional materials insofar as they stated that Congress passed tax laws intending to promote the subsidization of the cattle industry and that investing in a Hoyt partnership was therefore "socially desirable". Before investing in the Hoyt partnerships, petitioners did not consult with anyone

---

[1]Because Mr. Hansen did not testify at trial, there is no evidence in the record with respect to his understanding of the nature of the Hoyt investment.

other than members of the Hoyt organization and investors in Hoyt partnerships--such as other cattle ranchers, independent investment consultants, or independent tax advisers--concerning either the partnerships or the tax claims made by the partnerships.

Petitioners signed a number of documents in connection with their investment in the Hoyt partnerships; those documents that appear in the record are summarized as follows. On December 17, 1986, both petitioners signed a document titled "Instructions to the Managing General Partner".[2] This document stated in relevant part:

> (1) You [Mr. Hoyt] have the authority to sign my [petitioners'] name to full recourse Promissory Notes used for the purchase of breeding cattle to be held as an investment by the above Limited Partnership [Shorthorn Genetic Engineering 1986], purchased from HOYT & SONS RANCHES, an Oregon Partnership, in Burns, Oregon, but only on notes that were made for the purchase of Registered Shorthorn Breeding Cattle from HOYT & SONS RANCHES.
>
> (2) You must inform me of the amount of Partnership liabilities I have personally assumed in order to increase my tax basis and qualify for income tax deductions. I understand I can refuse, at the end of any year, to obligate myself to any additional liability and reserve the right to notify you in writing that I refuse to incur any additional personal liability through my ownership in the above named Partnership.

_____

[2]Petitioners initially invested in the Hoyt partnerships in 1986. However, the partnership in which they initially invested was "rescinded", forcing petitioners to change their investment to a different partnership in 1987. It is unclear why the partnership was rescinded; Ms. Hansen believes it was because "the tax laws changed and so they had to do things a little differently."

* * * * * * *

(6)  I am a General Partner and a Limited Partner (<u>for tax
purposes only</u>) because I have personally assumed Partnership
liabilities (a Limited Partner does not personally assume
Partnership liabilities).

(7)  Because I have the right to increase or decrease
(including down to zero) the amount of cash I contribute to
the Partnership each year, you may charge my capital account
nine percent (9%) interest on the amount of unpaid required
contributions not paid until liquidation and distribution of
all Partnership assets.  The total cash I contribute during
the first five years of the Partnership's life, divided by
$2,500.00, must be the total number of units I will own.

* * * * * * *

(9)  By the sixth year the Partnership is in business, it
must begin selling raised breeding cattle to pay the
installment payments on cattle purchase notes.

When Ms. Hansen signed documents such as these, Ms. Hansen

believed that petitioners would be required to repay the

promissory notes.

On January 17, 1987, Mr. Hansen signed a form titled

"Instructions to Hoyt and Sons Ranches -- Acknowledgement of

Appointment of Power of Attorney".  This form provided:

(1)  I have given Walter J. Hoyt III the irrevocable
authority to sign my name to a Certificate of Assumption of
Primary Liability Form as part of a transfer on a full
recourse Promissory Note in the amount of $175,000, that
will become part of a transfer of debt agreement between me,
the Partnership known as Durham Genetic Engineering 1986
Ltd., and HOYT & SONS RANCHES, said note having been
delivered to HOYT & SONS RANCHES to pay for breeding cattle
purchased from HOYT & SONS RANCHES, an Oregon Partnership,
in Burns, Oregon, which are to be held as breeding cattle by
the above named Partnership.  This authorizes Mr. Hoyt to
sign my name on the notes that were made for the purchase of
Registered Durham Breeding cattle from HOYT & SONS RANCHES,

and no other purpose.  I understand I will owe this amount directly to HOYT & SONS RANCHES, and not to my partnership.

\* \* \* \* \* \* \*

(4)  My goal is that the value of my share of the cattle owned by the Partnership, in which you have a secured party interest, must never fall below the amount for which I am personally liable.  If the value of my cattle does fall below the amount of my loan, and you become aware of that, you must so notify me within thirty days in order that I may make a damage claim to W.J. Hoyt Sons Management Company for possible default on the Share-Crop Operating Agreement, and/or the cattle fertility warranties.

Also on January 17, 1987, Mr. Hansen signed a document titled "Instructions to the Managing General Partner and and [sic] Acknowledgement of Certain Agreements".  The provisions of this document are similar to those in the above-described documents, and they include a grant of authority to Mr. Hoyt to sign a "full recourse Promissory Note" in the amount $175,000 with respect to a partnership known as Durham Genetic Engineering 1986-4 Ltd.  On March 15, 1989, Ms. Hansen signed a "Bull Reservation Form", purporting to reserve two bulls for petitioners to contribute to the partnership Timeshare Breeding Service, J.V., in exchange for a payment of $2,000.  Finally, on or around February 22, 1990, both petitioners signed a "Promissory Note" and "Security Agreement", in which petitioners agreed to pay "Timeshare Breeding Service Joint Venture 89" the amount of $3,500, plus interest of 10 percent.  The note provided for 10 payments of $350 to be made monthly.

Petitioners were involved in a variety of different cattle breeding partnerships from 1987 through 1996, including Shorthorn Genetic Engineering 1986-B, Hoyt and Sons Trucking, Timeshare Breeding Services, and Timeshare Breeding Services 1989-1. During the year in issue, petitioners were involved with the partnerships known as Durham Shorthorn Breed Syndicate 1987-A, J.V. (DSBS 87-A) and Durham Shorthorn Breed Syndicate 1987-C, J.V. (DSBS 87-C). Ms. Hansen believed that the Hoyt organization's frequent changing of their partnership investments was the result of tax law changes rather than problems with the underlying business operations.

Although petitioners did not personally visit or otherwise independently investigate the cattle ranching operations prior to their investment, in 1990 and again in 1993 petitioners participated in "ranch tours". These tours were annual events where partners met one another, toured Hoyt-related ranches, and talked with people involved in the Hoyt organization. When visiting the ranches, Ms. Hansen did not know which cattle belonged to any given partnership, or whether the herds were segregated in any manner. Beginning sometime in either 1989 or the early 1990s, petitioners also attended a number of monthly meetings of Hoyt partners that were held near petitioners' home. Various guest speakers were invited to these meetings, and members of the Hoyt organization would also attend on occasion.

In 1989, petitioners received from the Hoyt organization a copy of this Court's opinion in Bales v. Commissioner, T.C. Memo. 1989-568. Mr. Hoyt touted the Bales opinion as proof that the Hoyt partnerships were legal, and that the IRS was incorrect in challenging their tax claims. Petitioners read the opinion, and Ms. Hansen believed that "It set a precedent for the ability to be able to use this business to be able to recap depreciation and losses through tax writeoffs." Despite the fact that neither petitioners nor their partnerships were involved as parties in the Bales case, Ms. Hansen believed that the opinion meant "that the things that needed to be understood that weren't previously were now understood, that is was a legal operation and that nothing was wrong" with respect to the tax benefits being derived from the Hoyt partnerships.

Petitioners made substantial cash payments to the Hoyt organization during the years 1987 through 1997. In a summary of such payments prepared by petitioners, they estimate that the total amount of these payments exceeds $100,000. These payments included the remittance of their tax refunds, the payment of quarterly and monthly installments on their promissory notes, special "assessments" imposed by the partnerships, and contributions to purported individual retirement account plans maintained by the Hoyt organization. Petitioners have not received any of their contributions back from the Hoyt

organization.  Before and after the year in issue, petitioners received numerous documents purporting to show both the legitimacy of the Hoyt partnerships and the legality of the tax claims being made by the Hoyt organization.  The Hoyt organization also portrayed employees of the IRS as incompetent and claimed that they were engaging in unjust harassment of Hoyt investors.  Petitioners trusted these documents and believed and relied upon what the Hoyt organization told them.

III.  Petitioners' Federal Tax Claims

On petitioners' original joint Federal income tax returns for the years 1984 and 1985, they reported adjusted gross income of $39,315 and $52,048, respectively.  After petitioners invested in the Hoyt partnerships in 1986, they filed a Form 1045, Application for Tentative Refund, on which they claimed tentative refunds for the years 1984 and 1985, based upon a claimed net operating loss (NOL) carryback of $79,171 from 1987.  This form reflects originally-reported tax liabilities for these years of $6,299 and $8,886, respectively, and tax liabilities of zero in both years after applying the claimed NOL carryback.  Petitioners reported the following on their joint Federal income tax returns in the respective taxable years:

|              | 1987     | 1988     | 1989     | 1990     |
|--------------|----------|----------|----------|----------|
| Income[1]    | $65,750  | $59,281  | $61,239  | $63,388  |
| Partnership losses | 142,950 | 28,972 | 37,249 | 41,470  |
| Tax liability | -0-     | 2,344    | 1,902    | 1,466    |

[1]Includes taxable income from wages, interest, and dividends.

The Form 1045 and each of the returns from 1987 through 1990 were prepared by an individual affiliated with the Hoyt organization.

By letter dated April 25, 1989, respondent notified petitioners that one of their Hoyt partnerships was under review. This letter stated in relevant part:

> Our information indicates that you were a partner in the above partnership [DSBS 87-C] during the above tax year [1988]. Based upon our review of the partnership's tax shelter activities, we have apprised the Tax Matters Partner that we believe the purported tax shelter deductions and/or credits are not allowable and, if claimed, we plan to examine the return and disallow the deductions and/or credits. The Internal Revenue Code provides, in appropriate cases, for the application [of various penalties].

In January 1992, respondent mailed Hoyt investors, including petitioners, a letter regarding the application of section 469 (relating to passive activity loss limitations). That same month, Mr. Hoyt mailed a letter to investors, including petitioners, setting forth arguments that Hoyt investors materially participated in their investments within the meaning of section 469. In this letter, Mr. Hoyt stated that respondent's assertions in the preceding letter were incorrect, and that the investors should do what was necessary to participate in their investment at least 100 or 500 hours per

year, depending upon the circumstances, in order to meet the section 469 requirements. Mr. Hoyt stated that the time investors spent in recruiting new investors, as well as "reading and thinking about these letters", would count toward the material participation hourly requirements. Finally, in this letter Mr. Hoyt emphasized that "The position of your partnership is that it is not a tax shelter", because tax shelters "are never recognized for Federal income tax purposes." By letter dated February 11, 1992, respondent mailed petitioners a notice stating:

> In Mr. Hoyt's letter misleading and/or inaccurate premises were made which may directly affect you and your decision-making process in filing your 1991 individual tax return.
> First, a "tax shelter" is not necessarily synonymous with a "sham" investment. Low income housing credits, your personal residence, and real estate rentals are examples of tax shelters. It is an oversimplification to state tax shelters are never recognized for Federal income tax purposes.
> The letter stated that I failed to include number seven of the regulations which addresses the facts and circumstances test. Enclosed is the exact wording of this test, Regulation 1.469-5T(a)(7), and example #8 which refers to this regulation. Also enclosed is paragraph (b) that is referred to in paragraph (a)(7). Section 1402 noted in paragraph (b) defines income subject to self-employment tax. In the past, and currently, Mr. Hoyt has used Revenue Rulings 56-496, 57-58, and 64-32 as authorities for investors having met the material participation requirement. These rulings and the court cases he has cited are prior to the enactment of section 469 and all refer to section 1402. Please note in (b)(2) that meeting the material participation requirement of Section 1402 is specifically excluded from being taken into account for having met the material participation requirement of section 469 in using the facts and circumstances test of (a)(7).

Whether a person meets the material participation requirement of section 469 is a factual determination. The Reg. 1.469-5T(f)(2)(ii) defines investors' activities that are not considered in meeting the hourly requirement. Simply signing a statement or making an election are not a means in meeting the requirement. Although Section 469 may not have existed at the time of your initial investment, it is law that investors have to address in claiming investment losses today. Contrary to Mr. Hoyt's statement, time spent reading and thinking about this issue should not be considered as material participation hours for 1992.

If this letter is somewhat confusing or you are questioning the accuracy of this letter, I recommend you consider having an independent accountant or attorney review this matter with you.

Petitioners also received several notices informing them that respondent was beginning an examination of various partnerships in which petitioners had been involved. Petitioners received such notices dated June 19, 1989, June 26, 1989, August 13, 1990, January 28, 1991, February 19, 1991, May 13, 1991, February 3, 1992, and February 18, 1992. Finally, petitioners had been notified by respondent by letter dated December 9, 1988, that their 1987 individual income tax return had been selected for examination prior to issuance of the requested refund; the refund was subsequently issued on February 20, 1989.

In June 1992, petitioners completed their joint Federal income tax return for their taxable year 1991. They reported the following items of income and loss on this return:

| | |
|---|---|
| Wage income | $72,690 |
| Interest income | 110 |
| Rental property loss | (2,534) |
| DSBS 87-A loss | (27,170) |
| DSBS 87-C loss | (32,306) |
| Farm income | 8,681 |
| Total income | 19,471 |

The losses from DSBS 87-A and DSBS 87-C were reported on Schedules K-1, Partner's Share of Income, Credits, Deductions, Etc., issued to both petitioners by the partnerships for the partnerships' taxable years ending in 1991. Although it appears from the return that the farming income is related to petitioners' Hoyt investment, it is unclear how this amount of income was calculated or earned. Petitioners reported a total tax liability of $799 for 1991. Attached to the return was a "Material Participation Statement". On this statement, petitioners averred that they spent 114 hours during 1991 working in various Hoyt-related activities. The 1991 return was signed by Mr. Hoyt as the return preparer on June 19, 1992, it was signed by petitioners on June 27, 1992, and it was stamped "Received" by respondent on July 23, 1992.

Starting with the Form 1045 and the 1987 return, and continuing through the 1991 return, Mr. Hoyt or a member of the Hoyt organization prepared petitioners' tax forms. Upon signing the returns, Ms. Hansen did not know how the Hoyt-related items were derived; she knew only that Mr. Hoyt or a member of his organization had entered the items on the Schedules K-1 and on

the returns, and she assumed the items were therefore correct. Petitioners did not have the returns reviewed by an accountant or anyone else outside the Hoyt organization prior to signing them.

The section 6662(a) accuracy-related penalty in this case is derived solely from the loss that petitioners claimed in 1991 with respect to DSBS 87-C. Respondent issued a Notice of Final Partnership Administrative Adjustment (FPAA) to petitioners with respect to DSBS 87-C that reflected the disallowance of various deductions claimed on the partnership return for its taxable year ending in 1991. Because a timely petition to this Court was not filed in response to the FPAA issued for DSBS 87-C, respondent made a computational adjustment assessment against petitioners with respect to the FPAA. The computational adjustment of $40,892 changed petitioners' claimed DSBS 87-C loss of $32,306 to income of $8,586, increasing petitioners' tax liability by $7,724, from $799 to $8,523.[3] In the notice of deficiency underlying this case, respondent determined that petitioners are liable for the section 6662(a) accuracy-related penalty for negligence or disregard of rules or regulations with respect to the entire amount of the underpayment resulting from the DSBS 87-C computational adjustment.

_____

[3]The amount of the farm income reported by petitioners on their 1991 return was not changed by respondent pursuant to the computational adjustment assessment, presumably because the farm income was not a partnership item.

OPINION

## I.  Evidentiary Issues

As a preliminary matter, we address evidentiary issues raised by the parties in the stipulations of facts.  Petitioners and respondent reserved objections to a number of the exhibits and paragraphs contained in the stipulations, all on the grounds of relevancy.  We address here those objections that were not withdrawn by the parties at trial.  Federal Rule of Evidence 402[4] provides the general rule that all relevant evidence is admissible, while evidence which is not relevant is not admissible.  Federal Rule of Evidence 401 provides that "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  While certain of the exhibits and stipulated facts are given little to no weight in our finding of ultimate facts in this case, we hold that the exhibits and stipulated facts meet the threshold definition of "relevant evidence" under Federal Rule of Evidence 401, and that the exhibits and stipulated facts therefore are admissible under Federal Rule of Evidence 402.  Accordingly, to the extent that

---

[4]The Federal Rules of Evidence are applicable in this Court pursuant to sec. 7453 and Rule 143(a).

the Court did not overrule the relevancy objections at trial, we do so here.

## II. The Section 6662(a) Accuracy-Related Penalty

Section 6662(a) imposes an addition to tax of 20 percent on the portion of an underpayment attributable to any one of various factors, one of which is "negligence or disregard of rules or regulations".  Sec. 6662(a) and (b)(1).  "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard of rules or regulations" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  The regulations under section 6662 provide that negligence is strongly indicated where:

> A taxpayer fails to make a reasonable attempt to ascertain
> the correctness of a deduction, credit or exclusion on a
> return which would seem to a reasonable and prudent person
> to be "too good to be true" under the circumstances * * * .

Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

Negligence is defined as the "'lack of due care or failure to do what a reasonable or ordinarily prudent person would do under the circumstances.'"  Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part on another ground 43 T.C. 168 (1964)); see Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989).  Negligence is determined by testing a taxpayer's conduct against that of a reasonable, prudent person.  Zmuda v. Commissioner, 731 F.2d

1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Courts generally look both to the underlying investment and to the taxpayer's position taken on the return in evaluating whether a taxpayer was negligent. Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996), affg. T.C. Memo. 1994-217. When an investment has such obviously suspect tax claims as to put a reasonable taxpayer under a duty of inquiry, a good faith investigation of the underlying viability, financial structure, and economics of the investment is required. Roberson v. Commissioner, T.C. Memo. 1996-335, affd. without published opinion 142 F.3d 435 (6th Cir. 1998) (citing LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); Horn v. Commissioner, 90 T.C. 908, 942 (1988)).

The Commissioner's decision to impose the negligence penalty is presumptively correct.[5] Rule 142(a); Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Hansen v. Commissioner, 820 F.2d 1464, 1469 (9th Cir. 1987). A taxpayer has the burden of

---

[5]While sec. 7491 shifts the burden of production and/or burden of proof to the Commissioner in certain circumstances, this section is not applicable in this case because respondent's examination of petitioners' return did not commence after July 22, 1998. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

proving that respondent's determination is erroneous and that he did what a reasonably prudent person would have done under the circumstances. See Rule 142(a); Hansen v. Commissioner, supra; Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337; Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

III. Application of the Negligence Standard

Although petitioners had no experience in farming or ranching, and petitioners did not consult any independent investment advisers, petitioners made the decision to invest in a cattle ranching activity as a means to provide for their retirement. As part of their initial investment in the Hoyt partnerships, petitioners provided Mr. Hoyt with the authority to sign promissory notes on their behalf in an amount of at least $175,000. Ms. Hansen, and presumably Mr. Hansen, believed that petitioners would be personally liable on these promissory notes in the event that a problem arose causing there to be insufficient value in the cattle to cover the amount of the notes. Nevertheless, petitioners placed their trust entirely with the promoters of the investment, and they did not investigate either the legitimacy of the partnerships or the implications of the promissory notes. We conclude that petitioners were negligent in signing the promissory notes and in entering into the investment.

In the years 1987 through 1991, petitioners used the Hoyt investment to report a total Federal income tax liability of $6,511 on income totaling $322,458. In addition, petitioners filed the Form 1045 which purportedly reduced their combined 1984 and 1985 Federal income liabilities from $15,165 to zero. Petitioners claimed these tax benefits based solely on the advice that they received from the promoters of the investment and from other Hoyt investors. Furthermore, the promotional materials that petitioners received had clearly indicated that there were substantial tax risks in making an investment. Nevertheless, petitioners did not investigate the tax claims being made by the Hoyt organization with anyone outside the organization.

When it came time to prepare petitioners' tax returns and claim the losses being reported by the Hoyt partnerships, petitioners relied on the very people who were receiving the bulk of the tax savings generated by the claims. Thus, the same individuals who sold petitioners an interest in the Hoyt partnerships and who ran the purported ranching operations also prepared the partnerships' tax returns, prepared petitioners' tax returns, and received from petitioners most of the tax savings that resulted from the positions taken on petitioners' returns.

With respect to 1991, the year in issue in this case, petitioners claimed that they incurred $59,476 in losses from the Hoyt partnerships. Ms. Hansen did not know, and there is no

evidence that Mr. Hansen knew, how these losses were derived; she knew only that the Hoyt organization had reported the amounts on the Schedules K-1 and on petitioners' tax return. Petitioners claimed these losses despite the fact that respondent had been warning petitioners, at least since December 1988, that there were potential problems with the tax claims being made on both the partnership returns and on petitioners' returns. Prior to signing their 1991 return, petitioners had received at least 11 separate letters from respondent alerting petitioners to suspected problems or alerting petitioners to reviews that had been commenced with respect to various Hoyt partnerships in which they were involved. Despite these letters, petitioners did not further investigate the partnership losses, such as by consulting an independent tax adviser, before claiming the losses as deductions on their 1991 return. We conclude that petitioners were negligent in 1991 in claiming the Hoyt partnership loss at issue in this case; namely, the $32,306 loss from DSBS 87-C.

IV. Alleged Defenses to the Accuracy-Related Penalty

Section 6664(c)(1) provides that the section 6662(a) accuracy-related penalty is not imposed "with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." "The determination of whether a taxpayer acted with reasonable cause and in good faith

is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs. The extent of the taxpayer's effort to ascertain his proper tax liability is generally the most important factor. Id.

A. Reliance on the Hoyt Organization and Hoyt Partners

Petitioners first argue that they should escape the negligence penalty because they relied in good faith on various individuals with respect to the Hoyt investment: Mr. Hoyt and other members of the Hoyt organization, tax professionals hired by the Hoyt organization, and other Hoyt investor-partners.

Good faith reliance on professional advice concerning tax laws may be a defense to the negligence penalties. United States v. Boyle, 469 U.S. 241, 250-251 (1985); see also sec. 1.6664-4(b)(1), Income Tax Regs. However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). In order to be considered as such, the reliance must be reasonable. Id. To be objectively reasonable, the advice generally must be from competent and independent parties unburdened with an inherent conflict of interest, not from the promoters of the investment. Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480; LaVerne v. Commissioner, 94 T.C. at 652; Rybak v.

Commissioner, 91 T.C. 524, 565 (1988); Edwards v. Commissioner, T.C. Memo. 2002-169.

It is clear in this case that the advice petitioners received, if any, concerning the partnership loss deduction that resulted in the underlying deficiency was not objectively reasonable. First, we note that petitioners have not established that they received any advice at all concerning the deduction. Although petitioners relied on Mr. Hoyt and his organization to prepare the return, Ms. Hansen's testimony and the other evidence in the record does not suggest that petitioners directly questioned Mr. Hoyt or his organization about the nature of the tax claims. When petitioners signed the return, they did not question or seek advice from anyone concerning the large partnership loss at issue. Nevertheless, assuming arguendo that petitioners did receive advice from Mr. Hoyt or someone within his organization, any such advice that they received is in no manner objectively reasonable. Mr. Hoyt and his organization created and promoted the partnership, they completed petitioners' tax return, and they stood to profit from doing so. For petitioners to trust Mr. Hoyt or members of his organization for tax advice and/or to prepare their returns under these circumstances was inherently unreasonable.

In addition to relying on members of the Hoyt organization itself, petitioners argue that they relied on tax professionals

hired by the Hoyt organization and on other Hoyt investors. Petitioners, however, have established only that they believed that the Hoyt organization and the other partners had consulted with tax professionals. Petitioners have not established in what manner they personally relied upon any such professionals, or even the details of what advice the professionals provided that would be applicable to petitioners' situation with respect to the year in issue. Furthermore, because all of these individuals were affiliated with the Hoyt organization, it would have been objectively unreasonable for petitioners to rely upon them in claiming the tax benefits advertised by that very organization.

B. Deception and Fraud by Mr. Hoyt

Petitioners next argue that they should not be liable for the negligence penalty because they were defrauded and otherwise deceived by Mr. Hoyt with respect to their investment in the Hoyt partnerships. In this regard, petitioners first argue that the doctrine of judicial estoppel bars application of the negligence penalty because the U.S. Government successfully prosecuted Mr. Hoyt for, in general terms, defrauding petitioners.

Judicial estoppel is a doctrine that prevents parties in subsequent judicial proceedings from asserting positions contradictory to those they previously have affirmatively persuaded a court to accept. United States ex rel. Am. Bank v. C.I.T. Constr., Inc., 944 F.2d 253, 258-259 (5th Cir. 1991);

Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598-599 (6th Cir. 1982). Both this Court and the Court of Appeals for the Ninth Circuit, to which appeal in this case lies, have accepted the doctrine of judicial estoppel. See Helfand v. Gerson, 105 F.3d 530 (9th Cir. 1997); Huddleston v. Commissioner, 100 T.C. 17, 28-29 (1993).

The doctrine of judicial estoppel focuses on the relationship between a party and the courts, and it seeks to protect the integrity of the judicial process by preventing a party from successfully asserting one position before a court and thereafter asserting a completely contradictory position before the same or another court merely because it is now in that party's interest to do so. Edwards v. Aetna Life Ins. Co., supra at 599; Huddleston v. Commissioner, supra at 26. Whether or not to apply the doctrine is within the sound discretion of the court, but it should be applied with caution in order "to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement." Daugharty v. Commissioner, T.C. Memo. 1997-349 (quoting Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir. 1990)), affd. without published opinion 158 F.3d 588 (11th Cir. 1998)).

Judicial estoppel generally requires acceptance by a court of the prior position and does not require privity or detrimental

reliance of the party seeking to invoke the doctrine.  Huddleston
v. Commissioner, supra at 26.  Acceptance by a court does not
require that the party being estopped prevailed in the prior
proceeding with regard to the ultimate matter in dispute, but
rather only that a particular position or argument asserted by
the party in the prior proceeding was accepted by the court.  Id.

Respondent's position in this case is in no manner
contradictory to the position taken by the United States in the
criminal conviction of Mr. Hoyt.  See, e.g., Goldman v.
Commissioner, 39 F.3d 402, 408 (2d Cir. 1994) (taxpayer-
appellants' argument that an investment partnership "constituted
a fraud on the IRS, as found by a civil jury * * * and by the tax
court * * * cannot justify appellants' own failure to exercise
reasonable care in claiming the losses derived from their
investment"), affg. T.C. Memo. 1993-480.  To the contrary, this
Court has sustained a finding of negligence with respect to
investors who had been victims of deception by tax shelter
promoters.  For example, in Klieger v. Commissioner, T.C. Memo.
1992-734, this Court held that taxpayers in a situation similar
to that of petitioners were negligent.  In Klieger, we addressed
taxpayers' involvement in certain investments that were sham
transactions that lacked economic substance:

> Petitioners are taxpayers of modest means who were
> euchred by Graham, a typical shifty promoter.  Graham sold
> petitioners worthless investments by giving spurious tax
> advice that induced them to reduce their withholding and

> turn their excess pay over to Graham as initial payments to acquire interests in "investment programs" that did not produce any economic return and apparently never had any prospects of doing so. Graham purported to fulfill his prophecies about the tax treatment of the Programs by preparing petitioners' tax returns and claiming deductions and credits that have been disallowed in full, with resulting deficiencies* * *.

> * * * * * * *

> When a tax shelter is a sham devoid of economic substance and a taxpayer relies solely on the tax shelter promoter to prepare his income tax return or advise him how to prepare the return with respect to the items attributable to the shelter that the promoter has sold him, it will be difficult for the taxpayer to carry his burden of proving that he acted reasonably or prudently. Although a tax shelter participant, as a taxpayer, has a duty to use reasonable care in reporting his tax liability, the promoter who prepares the participant's tax return can be expected to report large tax deductions and credits to show a relatively low amount of tax due, and thereby fulfill the prophecies incorporated in his sales pitch.

We conclude that there are no grounds for application of judicial estoppel in the present case.

In a vein similar to their judicial estoppel argument, petitioners further argue that Mr. Hoyt's deception resulted in an "honest mistake of fact" by petitioners when they entered into their investment. More specifically, petitioners assert that they had insufficient information concerning the losses and that "all tangible evidence available to the Hoyt partners supported Jay Hoyt's statements."

Reasonable cause and good faith under section 6664(c)(1) may be indicated where there is "an honest misunderstanding of fact or law that is reasonable in light of all the facts and

circumstances, including the experience, knowledge, and education of the taxpayer." Sec. 1.6664-4(b)(1), Income Tax Regs. However, "reasonable cause and good faith is not necessarily indicated by reliance on facts that, unknown to the taxpayer, are incorrect." Id.

For the reasons discussed above in applying the negligence standard, whether or not petitioners had a "mistake of fact" does not alter our conclusion that petitioners' actions in relation to their investment and the tax claims were objectively unreasonable. Furthermore, and again for the reasons discussed above, petitioners' failure to investigate further--beyond what was made available to them by Mr. Hoyt and his organization--was also not an objectively reasonable course of action.

C. Petitioners' Investigation

Petitioners further argue that they had reasonable cause for the underpayment because they made a reasonable investigation into the partnership, taking into account the level of their sophistication. Petitioners assert that this investigation yielded no indication of wrongdoing by Mr. Hoyt, and petitioners further assert that an "average taxpayer was unable to discover Hoyt's fraud". As we have held, petitioners' investigation into the partnership went no further than members of the Hoyt organization and other Hoyt partner-investors. Relying on these individuals as a source of objective information concerning the

partnerships was not reasonable.  Furthermore, even assuming that an "average taxpayer" would have been unable to discover any wrongdoing, petitioners were nevertheless negligent in not further investigating the partnership and/or seeking independent advice concerning it.

D.  The Bales Opinion

Petitioners next argue that they had reasonable cause for the underpayment because of this Court's opinion in Bales v. Commissioner, T.C. Memo. 1989-568.[6]  The Bales case involved deficiencies asserted against various investors in several different cattle partnerships marketed by Mr. Hoyt.  This Court found in favor of the investors on several issues, stating that "the transaction in issue should be respected for Federal income tax purposes."  Bales involved different investors, different partnerships, different taxable years, and different issues than those underlying the present case.

---

[6]Petitioners also argue that the opinion in Bales v. Commissioner, T.C. Memo. 1989-568, provided "substantial authority for the positions taken on petitioners' 1991 income tax return."  There is no explicit "substantial authority" exception to the sec. 6662(a) accuracy-related penalty for negligence. Hillman v. Commissioner, T.C. Memo. 1999-255 n.14 (citing Wheeler v. Commissioner, T.C. Memo. 1999-56).  While petitioners refer to the "reasonable basis" exception to the negligence penalty, set forth in sec. 1.6662-3(b)(3), Income Tax Regs., they do not specifically argue that the exception applies in this case. Nevertheless, we note that the record does not establish that petitioners had a reasonable basis for claiming the partnership loss at issue in this case.

First, petitioners argue they relied on <u>Bales</u> in claiming the deduction for the partnership loss. Without further addressing the applicability of <u>Bales</u> to petitioners' situation, we find that petitioners have not established that they relied on <u>Bales</u> in this manner. The record shows that petitioners relied instead on the interpretation of <u>Bales</u> provided by Mr. Hoyt and his organization, who repeatedly claimed that <u>Bales</u> was proof that the partnerships and the tax positions were legitimate. We have already found that petitioners' reliance on Mr. Hoyt and his organization was objectively unreasonable and, as such, not a defense to the negligence penalty. Accepting Mr. Hoyt's assurances that <u>Bales</u> was a wholesale affirmation of his partnerships and his tax claims was no less unreasonable.

Second, petitioners argue that, because this Court was unable to uncover the fraud or deception by Mr. Hoyt in <u>Bales</u>, petitioners as individual taxpayers were in no position to evaluate the legitimacy of their partnership or the tax benefits claimed with respect thereto. This argument employs the <u>Bales</u> case as a red herring: The <u>Bales</u> case involved different investors, different partnerships, different taxable years, and different issues. Furthermore, adopting petitioners' position would imply that taxpayers should have been given carte blanche to invest in partnerships promoted by Mr. Hoyt, merely because Mr. Hoyt had previously engaged in activities which withstood one

type of challenge by the Commissioner, no matter how illegitimate the partnerships had become or how unreasonable the taxpayers were in making investments therein and claiming the tax benefits that Mr. Hoyt promised would ensue.

E.  Fairness Considerations

Petitioners' final arguments concerning application of the accuracy-related penalty are in essence arguments that imposition of the penalty would be unfair or unjust in this case. Petitioners argue that "The application of penalties in the present case does not comport with the underlying purpose of penalties."  To this effect, petitioners argue that, in this case,

> the problem was not Petitioners' disregard of the tax laws, but was Jay Hoyt's fraud and deception.  Petitioners did not engage in noncompliant behavior, instead they were the victims of a complex fraud that it took Respondent years to completely unravel.

> Petitioners made a good faith effort to comply with the tax laws and punishing them by imposing penalties does not encourage voluntary compliance, but instead has the opposite effect of the appearance of unfairness by punishing the victim.  Indeed, penalties are improper for any investor in the Hoyt partnerships on a policy basis alone.  [Fn. ref. omitted.]

We are mindful of the fact that petitioners were victims of Mr. Hoyt's fraudulent actions.  Petitioners ultimately lost the bulk of the tax savings that they received, which they had remitted to Mr. Hoyt as part of their investment, and which they never received back.  Nevertheless, petitioners believed that this

money was being used for their own personal benefit--at the time that they claimed the tax savings, they believed that they would eventually benefit from them. Petitioners also lost a substantial amount of out-of-pocket cash which they paid to Mr. Hoyt in the years preceding and following the year in issue. In fact, some of the later payments were made in response to not-so-thinly-veiled threats by Mr. Hoyt of retaliatory action if petitioners failed to remit the payments. However, this does not alter our conclusion that petitioners were negligent with respect to entering the Hoyt investment, and that they were negligent with respect to the positions that they took on their 1991 tax return. Despite Mr. Hoyt's actions, the positions taken on the 1991 return signed by petitioners were ultimately the positions of petitioners, not of Mr. Hoyt.

V. Conclusion

Upon the basis of the record before the Court, we conclude that petitioners' actions in relation to the Hoyt investment constituted a lack of due care and a failure to do what reasonable or ordinarily prudent persons would do under the circumstances. First, petitioners entered into an investment, allegedly involving at least $175,000 of personal debt, without investigating its legitimacy. Second, and foremost, petitioners trusted individuals who told them that they effectively could escape paying Federal income taxes for a number of years--

petitioners reported a combined tax liability of $6,511 on $413,821 of income over 7 taxable years--based solely upon the advice of the individuals promoting the tax shelter. Our conclusion is reinforced by the fact that petitioners received multiple warnings from respondent, including one as late as February 1992, warnings that petitioners ignored. We find that petitioners were negligent with respect to entering the Hoyt investment, and that they were negligent with respect to claiming the DSBS 87-C loss on their return.

To reflect the foregoing,

Decision will be entered for respondent.